IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHELDON PINK, et al., | : | |
|     Plaintiffs, | : | CIVIL ACTION |
| | : | No. 13-4924 |
| v. | : | |
| | : | |
| YASIN KHAN, et al., | : | |
|     Defendants. | : | |

November 7, 2018                                                                   Anita B. Brody, J.

### MEMORANDUM

Plaintiff/Relators Sheldon Pink and William Hughes bring this *qui tam* suit[1,2] against two sets of defendants: (1) Dr. Yasin Khan ("Dr. Y. Khan"), Dr. Elizabeth Khan, and a number of

---

[1] An action under the False Claims Act can be commenced in one of two ways. The United States Department of Justice can file suit, or, alternatively, a private plaintiff can institute a *qui tam* action on behalf of the United States to recover damages incurred due to fraudulent claims. 31 U.S.C. § 3730(b)(1). When suit is brought by a private plaintiff, known as the "relator," in this fashion, the government can elect to intervene. 31 U.S.C. § 3730(b)(2). On August 16, 2016, the government declined to intervene in this action. *See* ECF No. 37.

[2] In March 2012, Margaret Reynard, the Khan Defendants' former billing manager, also filed a *qui tam* complaint against the Khan Defendants, alleging that the Khan Defendants engaged in wrongful "incident to" billing practices. *See* Khan Defs.' Ex. B ("Reynard Qui Tam Compl.). Under Medicare and Medicaid reimbursement rules, care provided by non-physician practitioners (e.g., physician assistants and nurse practitioners) is reimbursed at a higher rate when it is provided "incident to" care provided by a physician. *Id*. The "incident to" billing rules require that a physician is physically present and provides direct supervision. *Id*. Reynard's complaint alleged that the Khan Defendants routinely billed for care provided by non-physician providers at the higher "incident to" rate, even when no supervising physician was present. *Id*. In August 2016, the United States government and the Khan Defendants reached a settlement regarding Reynard's *qui tam*. *See* Khan Defs.' Ex. C ("Settlement Agreement"). Hughes and Pink concede that this settlement precludes them from recovering under an FCA action for these wrongful "incident to" billing practices. Am. Compl. ¶¶ 93-115. Their Amended Complaint includes factual allegations related to "incident to" billing, but does not request damages related to Defendants' FCA liability for these allegations. *Id*. at ¶ 116.

1

healthcare entities operated by the Khans[3] (collectively, the "Khan Defendants"); and (2) Cheryl Kreider, the former Chief Operating Officer of one of the Khan entities, and Kreider's consulting business, Kreider Health Solutions, LLC, (collectively, the "Kreider Defendants"). Hughes and Pink formerly worked for the Khan Defendants.

Hughes and Pink bring claims under the False Claims Act ("FCA), for making false claims for MRI payment to the federal government, 31 U.S.C. § 3729(a)(1), for reverse false claims, 31 U.S.C. § 3729(a)(1)(G), and for whistleblower retaliation, 31 U.S.C. § 3730(h).[4] The Khan Defendants move for summary judgment on all claims. The Kreider Defendants move for summary judgment on the FCA and reverse FCA claims.[5] This Court has jurisdiction under 28 U.S.C. § 1331.

I will grant Defendants' motions for summary judgment on the FCA and reverse FCA claims. I will deny Defendants' motion for summary judgment on the retaliation claims.

---

[3] The Khan Defendants include four healthcare providers owned and operated by the Khans: Westfield Medical Center, L.P., formerly doing business as Westfield Hospital ("Westfield Hospital"); Lehigh Valley Pain Management, Inc. ("LVPM"); Westfield Surgical Center, L.P.; and Tilghman Medical Center, Inc. The Khan Defendants also include two businesses owned and operated by the Khans: WMC Management, Inc., the general partner of Westfield Hospital and the Surgical Center; and Khan Partnership, G.P., the owner of the property on which Westfield Hospital and the Surgical Center were located.

[4] In response to Defendants' summary judgment motions, Hughes and Pink only contend that Defendants are subject to FCA liability for issues related to MRI billing. They do not raise any of the additional FCA and reverse FCA claims alleged in the Amended Complaint. To the extent that Hughes and Pink are continuing to pursue any other theory of FCA liability, Hughes and Pink have put forth no evidence to support these theories. I will grant summary judgment on the FCA and reverse FCA claims with respect to all non-MRI allegations.

[5] On September 19, 2017, Hughes and Pink's retaliation claims against the Kreider Defendants were dismissed by the Court. *See* ECF No. 81.

I. **BACKGROUND**[6]

A. **The Parties**

The Khan Defendants are a series of healthcare providers and related entities owned and operated by Dr. Yasin Khan and Dr. Elizabeth Khan. The healthcare entities owned and operated by the Khans include Westfield Hospital,[7] and Lehigh Valley Pain Management, Inc. ("LVPM"). William Hughes and Sheldon Pink were formerly employed in business and financial management positions by the Khan Defendants.

In January 2012, Dr. Y. Khan hired Cheryl Kreider and her consulting business, Kreider Health Solutions, LLC, to serve as Westfield Hospital's Chief Operating Officer. Am. Compl. ¶ 174.

B. **Khan Defendants' MRI Facility**

Originally, LVPM, one of the Khan Defendants, owned a facility ("the MRI facility") that performed radiological scans using a technique called MRI, or magnetic resonance imaging. Pls.' Ex. C ("Y. Khan Dep. I") at 28:19-24. LVPM had a contract with AmeriHealth Mercy ("AmeriHealth"), a Medicaid-only health insurance provider. Under this contract, LVPM provided MRIs for people who received their health insurance from AmeriHealth. Y. Khan Dep. I at 42:2-9. In 2007, LVPM's MRI facility was sold to Westfield Hospital, in part so that the hospital would become eligible for a specific accreditation. Khan Dep. I at 29:5-6; Pls.' Ex. D ("Y. Khan Dep. II") at 62:24-63:9.

This transfer in ownership changed nothing else about the MRI facility, and the facility continued to be located in a building that was separate from Westfield Hospital. This building

---

[6] Unless otherwise noted, the facts are presented in the light most favorable to the non-moving parties. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[7] Westfield Hospital has since ceased to exist. Khan Defs.' Ex. G (Khan Decl.) at ¶ 5

was also home to other, non-hospital, medical facilities. Y. Khan Dep. II at 179:16-18; Pls. Ex. K ("Pink Dep.") at 180:10-181:8; Pls.' Ex. F ("Floor Plan.") Because the MRI facility was in a separate building, inpatients at Westfield Hospital could not be sent there without being transported by ambulance. Y. Khan Dep. I at 50:2-24.[8]

After the MRI facility was sold to Westfield Hospital, LVPM continued to bill AmeriHealth when patients insured by AmeriHealth—all of whom were Medicaid recipients—received an MRI at the MRI facility. Y. Khan Dep. I at 46:8-47:2. Thus, these patients still received a bill from LVPM—not Westfield Hospital, who now owned the MRI facility. *Id.* Dr. Y. Khan testified that LVPM had an agreement with Westfield Hospital that allowed LVPM to use the MRI facility for AmeriHealth patients. Y. Khan Dep. II at 74:12-20. According to Dr. Y. Khan, if an AmeriHealth patient received an MRI at the facility, AmeriHealth paid the LVPM "global fee," and portions of this were given to both Westfield Hospital and to the radiologist performing the MRI. Y. Khan Dep. I at 46:8-19.

C. **Hughes and Pink's Employment Relationship with the Khan Defendants**

In May 2011, Hughes was hired by Dr. Y. Khan as a Management and Financial Consultant for Westfield Hospital. Pls.' Ex. J ("Hughes Dep.") at 43:12-16. In October 2013, Hughes' employment was terminated. Hughes Dep. 25:13-17, 89:12-23. In December 2011, Pink was hired by Dr. Y. Khan as Director of Financial Operations for Westfield Hospital and several other entities operated by the Khans. Pls.' Ex. I ("Pink Offer Letter"). On May 16, 2013, Pink's employment was terminated. *See* Khan Defs. Ex. T ("Pink Termination Letter").

---

[8] Because of this, Defendants did not send Westfield inpatients to get MRIs at the facility. Y. Khan Dep. I at 50:2-24. The hospital did, however, give outpatients the option of receiving an MRI at the offsite facility. Y. Khan Dep. II at 67:11-68:15.

4

## II. LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Id.* In ruling on a motion for summary judgment, the court must draw all inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party has met its initial burden, the nonmoving party must then "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. Both parties must support their factual positions by: "(A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The materials in the record that parties may rely on include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In opposing a motion for summary judgment, the nonmoving party may not "rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

In essence, the inquiry at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

### III. DISCUSSION

All Defendants move for summary judgment on Hughes and Pink's False Claims Act claims. The Khan Defendants move for summary judgment on Hughes and Pink's retaliation claims.

#### A. False Claims Act Claims

"The False Claims Act is meant to reach all types of fraud that might result in financial loss to the Government." *United States ex rel. Petratos v. Genentech Inc*, 855 F.3d 481, 486 (3d Cir. 2017) (internal quotation marks omitted). A person is liable under the FCA if he or she "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1).

In order to establish an FCA claim at summary judgment, a plaintiff must "provide 'evidence of the actual submission of a false claim.'" *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 98 (3d. Cir. 2018) (quoting *Quinn v. Omnicare, Inc.*, 382 F.3d 432, 439 (3d. Cir. 2004)). "A false or fraudulent claim may be either factually false or legally false." *Id*.

Hughes and Pink have provided evidence of only one type of claim submitted by the Khan Defendants to the federal government: claims submitted by LVPM. Hughes and Pink have failed to satisfy the requirements for proving at summary judgment that these claims were either factually or legally false.

### 1. Factually False

A claim is factually false when it "'misrepresents what goods or services . . . it provided to the Government . . . .'" *Greenfield*, 880 F.3d at 94 (quoting *United States ex rel. Wilkins v. United Health Grp.*, 659 F.3d 295, 305 (3d. Cir. 2011) (alterations in the original)). For example, the Third Circuit characterized as "factually false" allegations that the defendant charged Medicare as if it was using vials of medication only a single time (thus receiving payment for the full contents of the vial), when in reality the defendant was harvesting unused medication from the vials and using this on other patients. *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 157 (3d Cir. 2014). In *Foglia*, the defendant misrepresented the goods that were provided, because it represented to Medicare that the goods provided were vials used only once, when in fact the goods provided were vials used multiple times. *Id.* Conversely, a claim that classified patients as inpatients when they should have been classified as outpatients was not factually false because it did not misrepresent the actual medical treatment provided to the patients, even though this misrepresentation may have been material to the rate at which the treatment was billed. *United States v. Exec. Health Res., Inc.*, 196 F. Supp. 3d 477, 498 (E.D. Pa. 2016).

Hughes and Pink appear to argue that the submitted MRI claims were factually false because they misrepresented which healthcare entity actually provided the MRI.[9] *See* Pls.' Surreply 5 ("All of LVPM's MRI bills were false on their face because LVPM did not even own

---

[9] Hughes and Pink also assert that LVPM's MRI claims were false because "LVPM did not perform the MRIs but billed the federal government for them claiming as though they did." Pls.' Surreply at 4. The only evidence in the record as to who actually performed the MRIs is testimony from Dr. Y. Khan that LVPM had "an agreement or contract . . . with Westfield Hospital to utilize the facility to provide MRIs to AmeriHealth Mercy Patients." Y. Khan Dep. II at 74:12-20. Thus, Hughes and Pink have identified no evidence that LVPM did not actually perform the MRIs it billed AmeriHealth for. Even if LVPM had billed for MRIs it did not perform, it would not have submitted factually false claims, because it would not have misrepresented the goods or services (i.e. MRIs) provided.

or operate the MRI."). After the Khan Defendants transferred the ownership of the MRI facility from LVPM to Westfield Hospital, LVPM continued to bill AmeriHealth when AmeriHealth patients had MRIs at the facility—even though the MRI facility was then owned and operated by Westfield Hospital.

This does not amount to factual falsity. By continuing to submit bills for MRIs from LVPM after the MRI facility was transferred to Westfield, the Khan Defendants did not misrepresent what "goods or services" were provided. They did not "'submit[ ] a claim for cardiac bypass surgery when only an EKG was performed' or 'submit[ ] claims for services rendered to fictitious patients.'" *Exec. Health Res., Inc.*, 196 F. Supp. 3d at 498 (quoting *United States ex rel. Colucci v. Beth Israel Med. Ctr.*, 785 F. Supp. 2d 303, 314 (S.D.N.Y. 2011)) (alterations in the original). Rather, the Khan Defendants may have misrepresented the owner and operator of the facility providing the services. The government received exactly what it paid for: an MRI for an AmeriHealth patient.[10]

### 2. Legally False

Because the LVPM claims for MRI payment were not factually false, Hughes and Pink's FCA claims can only survive summary judgment if they establish that the LVPM claims were legally false.

A claim "is legally false when the claimant lies about its compliance with a statutory, regulatory, or contractual requirement." *Greenfield*, 880 F.3d at 94. A claimant can present a legally false claim by either expressly or implicitly certifying that it is in compliance with

---

[10] Indeed, Hughes and Pink make no allegation that the government overpaid because LVPM, instead of Westfield Hospital, billed AmeriHealth Mercy for MRIs. Even if this were the case, this still would not amount to a factually false claim, as long as an MRI was actually provided. *Cf. Exec. Health Res.*, 196 F. Supp. at 498 (finding that a misrepresentation relevant to the rate at which services was billed was not factually false). Nor do Hughes and Pink contend that there is a difference between the quality of an MRI provided by a pain clinic like LVPM and one provided by a hospital like Westfield Hospital.

regulations which are material to the government's decision to pay the claim. *Wilkins*, 659 F.3d at 305. At summary judgment, an FCA plaintiff must do more than "'merely . . . describe a private scheme in detail [and] . . . allege . . . that claims requesting illegal payments must have been submitted, were likely submitted[,] or should have been submitted to the Government.'" *Greenfield*, 880 F.3d at 98 (quoting *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002)). Rather, a plaintiff must "provide 'evidence of the actual submission of a false claim.'" *Id.* (quoting *Quinn*, 382 F.3d at 439). Put another way, an FCA plaintiff asserting legal falsity at summary judgment must provide two things: (1) a theory of falsity—i.e. a statute, regulation, or contract that the claimant is not complying with; and (2) evidence of a federal claim misrepresenting the claimant's compliance with that statute, regulation, or contract.

Hughes and Pink meet neither of these burdens. Hughes and Pink provide only one theory of legal falsity, and appear to argue that Defendants' claims were legally false because they made an implied certification about Defendants' compliance with regulations for offsite hospital departments.[11] But Hughes and Pink do not present any evidence of claims misrepresenting Westfield Hospital's compliance with those regulations, because they do not present evidence of a single claim submitted *by Westfield Hospital*.[12] Rather, they present only

---

[11] Because Hughes and Pink do not point to any express certification by Defendants, they must be relying on the "implied false certification" theory of liability. Under this theory, a claim may be legally false if, by submitting that claim for payment to the federal government, the defendant "impliedly certifies compliance with all conditions of payment." *Universal Health Servs., Inc. v. Escobar*, 136 S.Ct. 1989, 1995 (2016). In order to be legally false under this theory, a claim must meet three conditions. *Id.* at 2001. First, it must "not merely request payment, but also make[ ] specific representations about the goods or services provided." *Id.* Second, "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements" must "make[ ] those representations misleading half-truths." *Id.* Finally, the "misrepresentation . . . must be material to the Government's payment decision." *Id.* at 2002.

[12] To the extent Hughes and Pink argue that Westfield Hospital submitted MRI claims for federal payment, they have submitted no evidence. Although Hughes and Pink submit two documents that they

9

claims made *by LVPM*. Hughes and Pink do not explain how these claims—the only claims they might have evidence of—were a misrepresentation of LVPM's compliance with any statute, regulation, or contract. Indeed, Hughes and Pink do not even present any statute, regulation, or contract terms that LVPM was bound by.

Admittedly, Hughes and Pink do more than contend that Defendants are liable because they engaged in illegal activity and, at the same time, submitted federal claims related to that activity. Rather, as evidence of the actual submission of a false claim, Hughes and Pink point to Dr. Y. Khan's testimony that, after the ownership of the MRI facility was transferred from LVPM, LVPM continued to bill AmeriHealth, a Medicaid-only health insurance provider, when an AmeriHealth patient had an MRI at the facility. Because the MRI facility violated federal regulations for offsite hospital departments, Hughes and Pink argue, *every* MRI claim submitted by Defendants was false.

This argument fails because the only statute, regulation, or contract Hughes and Pink have brought to the Court's attention is a policy concerning offsite hospital departments, and only a claim made *by Westfield Hospital* could misrepresent Westfield Hospital's compliance with these regulations. Hughes and Pink's theory of legal falsity appears to be that all claims to the federal government for MRI payment—included those submitted by LVPM—were legally false because those claims falsely certified that Defendants were in compliance with federal

---

believe are evidence of claims submitted by Westfield Hospital, these documents prove no such thing. The first document (Pls.' Ex. G), shows Westfield Hospital's revenue generated by various departments, including the MRI department, for parts of 2011 and 2012. This document shows that Westfield Hospital generated revenue from MRIs, but does not show that any of this revenue came from claims for federal payment. The second document (Pls.' Ex. P) is a pie chart purporting to show the percentage of Westfield Hospital's revenue coming from various sources, including Medicare and Medicaid. This document is not dated, not authenticated, and features no indication that it even came from Westfield Hospital or another Khan Defendant. Even if this document is authentic, however, it does not prove that a federal claim for MRI payment was submitted by Westfield Hospital: it only shows that 38 percent of *total* revenue came from Medicaid and Medicare, not that any of this came from the MRI facility.

10

regulations for "provider-based departments," or hospital departments located physically separate from the hospital. *See* Pls.' Opp. to Summ. J. 20-23. The Centers for Medicare and Medicaid Services ("CMS"), the federal agency responsible for administering Medicare and Medicaid, "does not recognize facilities that share space with freestanding facilities to meet the definition of a 'department' of a hospital."[13] Pls.' Ex. H at 3. The MRI facility owned by Westfield Hospital was in a building that was physically separate from Westfield Hospital, and that was also home to other, non-hospital, healthcare entities. Therefore, Hughes and Pink argue, had the federal government known where the Westfield MRI facility was located, it would not have paid any claims for MRIs performed at the facility.

Hughes and Pink have made a convincing case that Westfield Hospital violated this policy, and if Hughes and Pink could point the Court to a claim for MRI payment submitted to the federal government by Westfield Hospital, they might have established that Defendants submitted a legally false claim. But Hughes and Pink have failed to provide evidence of an actual claim by Westfield Hospital. The only claims Hughes and Pink have provided any evidence of are claims submitted *by LVPM*. When the government received those claims for payment, it could not take them as an implied certification that the MRI facility was a compliant hospital department, because it had no way of knowing that the bill even came from a hospital department.[14]

---

[13] This policy is "necessary to maintain the integrity of what CMS considers to be a hospital and to protect the Medicare program and its beneficiaries from possible abuses as hospitals seek to maximize Medicare reimbursement." Pls.' Ex. H at 3; *see also* 65 Fed. Reg. 18433 (Apr. 7, 2000) ("By failing to distinguish properly between provider-based and free-standing facilities or organizations, we risk increasing program payments and beneficiary coinsurance with no commensurate benefit to the Medicare program or its beneficiaries and we jeopardize the delivery of safe and appropriate health care services to our beneficiaries.").

[14] Additionally, Hughes and Pink have not offered any evidence that the claims submitted made a "specific representation[] about the goods or services provided" and that this amounted to a "misleading

Alternatively, Hughes and Pink may have been able to survive summary judgment by showing that the claims they might have evidence of—the claims submitted *by LVPM*—were legally false. It may very well be that LVPM *did* violate some statute or regulation when it billed for an MRI performed on a machine it did not own. LVPM may also have breached its contract with AmeriHealth when it continued to bill AmeriHealth for MRIs after LVPM no longer owned the MRI facility.[15] But Hughes and Pink have provided the Court with no statute, regulation, or contract terms that could serve as a clue as to how LVPM's claims were legally false, nor made an effort to convince the Court that LVPM's claims for MRI payment were implied false certifications that LVPM had complied with a statute, regulation or contract. It is not enough for Hughes and Pink to rest solely on the assertion that the LVPM claims were "false by [their] nature." Pls.' Opp. to Summ. J. at 17.

For all the reasons stated above, Hughes and Pink have failed to provide evidence of "at least one claim" that was legally false.

## B. Reverse False Claims Act Claims

Hughes and Pink's Amended Complaint also alleges that Defendants are liable for violating 31 U.S.C. § 3279(a)(1)(G),[16] the "reverse false claims" provision of the FCA. To prove liability under this provision a "plaintiff must prove that the defendant did not pay back to the

---

half truth[]." *See Escobar*, 136 S. Ct. at 2001. Thus, even if Hughes and Pink had evidence of MRI claims submitted by Westfield Hospital, these claims still might not be legally false under the implied false certification theory.

[15] It may also be that the true victim of Defendants' fraud was the accreditor who gave Westfield Hospital a higher accreditation because Westfield Hospital owned an MRI facility, because the MRI facility was not actually a fully compliant hospital department. But Hughes and Pink have provided no evidence of the terms of Defendants' accreditation, nor argued that defrauding an accreditor can give rise to FCA liability.

[16] The Amended Complaint also alleges a violation of 31 U.S.C. § 3279(a)(7), a section of the statute that no longer exists.

government money or property that it was obligated to return." *Quinn*, 382 F.3d at 444. This provision may apply to overpayments of federal funds. 31 U.S.C. § 3279(b)(3).

Hughes and Pink contend that, as a result of Defendants' alleged false claims, Defendants received "overpayments" (i.e. funds they were not entitled to) that they were obliged by law to return,[17] and that the failure to return these overpayments violated the reverse false claims provision of the FCA.

Defendants argue that summary judgment should be granted on the reverse FCA claims because Hughes and Pink have not identified any facts in support of these allegations. Defendants are correct: Hughes and Pink put forth no specific record evidence pertaining to their reverse false claims allegations.[18] I will grant Defendants' motions on the reverse FCA claims.

C. **Retaliation Claims**

Hughes and Pink also bring employment retaliation claims against the Khan Defendants under the FCA, alleging that they were fired and denied compensation because they engaged in protected conduct. The Khan Defendants first contend that summary judgment should be granted against all Khan Defendants, except Westfield Hospital, because Hughes and Pink can only bring an FCA retaliation action against their "employers." The Khan Defendants also contend that Hughes and Pink neither engaged in protected conduct nor suffered any adverse employment actions because of protected conduct. Both these issues are factually intensive. There is a genuine dispute of material fact as to both who Hughes and Pink can bring their FCA

---

[17] "If a person has received an overpayment [of Medicare and Medicaid funds], the person shall . . . report and return the overpayment to [the government]" within 60 days of the date on which the overpayment was identified. 42 U.S.C. § 1320a-7(k)(d).

[18] Additionally, because Hughes and Pink's reverse false claims theory is premised on Defendants making false claims, and Hughes and Pink have identified no evidence of false claims, their reverse FCA claims necessarily fail.

13

retaliation claims against and whether they suffered retaliation.  I will deny summary judgment on the retaliation claims.

## IV. CONCLUSION

For the reasons above, I will grant Defendants' motions for summary judgment on all FCA and reverse FCA claims.  I will deny the Khan Defendants' motion for summary judgment on the retaliation claims.

                                              s/Anita B. Brody

                                          _____
                                          ANITA B. BRODY, J.

Copies **VIA ECF** on 11/7/2018